RECEIVED

APR 2 0 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

BERTHA M. HAMILTON
LAVELLE T. TULLIS
DEBI (TULLIS) BELL
JOHNNY W. FITT
JESSIE GRAY JR.
RUTH L. JOHNSON
ROGETTA T. ODHAMS
JESSIE LEE WADE
CAROLYN A. DAVIS
DENNIS M. EGELSTON
RICHARD A. MITCHELL
KAREN S. DAVIS

: CIVIL ACTION NO:

: JUDGE D. DRELL

: MAGISTRATE JUDGE KIRK

: Date Filed:

**6:10cv0664**

VERSUS

DR. SHIVANI NEGI
MS. BARBARA WATKINS
DR. HOLLIS REED
THE UNITED STATES OF AMERICA

---

**Monetary Damages Due to Violation of Plaintiff's Rights Under the
Civil Rights Act 1964 Title 18, Part I, Chapter 13, Section 241, 242, 245,
(action for deprivation of rights)**

Bertha M. Hamilton, In Proper Person
6512 Joyce St., Alexandria La. 71302

Dennis M. Egelston, In Proper Person
714 Harrington St., Jennings La. 70546

Lavelle T. Tullis,  In Proper Person
196 Bell Rd., Dry Prong, La. 71423

Debi (Tullis) Bell, In Proper Person
6816 Eslerfield Rd., Pineville, La. 71360


Johnny W. Fitt, In Proper Person
P.O. Box 62, Vidalia, La

Jessie Gray Jr., In Proper Person
74 Ball Powell St., Alexandria La., 71301

Ruth L. Johnson, In Proper Person
906 King Rd., Leesville, La., 71306

Rogetta T. Odhams, In Proper Person
P.O. Box 991, Laveen, Az. 85339

Jessie L. Wade, In Proper Person
2712 6th St., Alexandria, La. 71302

Carolyn A. Davis, In Proper Person
6101 Deerfield Dr., Alexandria La. 71301

Richard A. Mitchell
150 Tinker Rd., Pollock, La. 71467

Karen S. Davis
P.O. Box 366, Montgomery, La 71454

# TABLE OF CONTENTS

1. Table of Contents…………………………………….....................i

2. Table of Authorities………………………….............................ii

3. Pleadings……………………………........................................1 - 7

4. Proof of Pattern…………………………….............................7 - 29

5. Proof of Mail Fraud…………………………….......................29 - 30

6. Proof of Maltreatment & Intimidation of Employees…………..30 - 35

7. Procedure in Place to Prevent filing of Complaints…………….35 - 36

8. Argument…………………………….......................................36 - 42

9. Remedy……………………………..........................................42 - 43

10. Certificate of Service………………………….........................43

11. Appendix…………………………….......................................44

## TABLE OF AUTHORITIES

1st Amendment to the Constitution...................................2, 5

Civil Rights Act Title 42 U.S.C. 1983.................................2

U.S.C. Title 18, Part 1, Ch. 63 Sec 1347 & 1349 (Mail Fraud)...7, 37

Ku Klux Klan Act of 1871...................................................3

Civil Rights Act 1964 Title VI, Equal Employment
Opportunity, 42 U.S.C. 21.................................................2

Civil Rights Act 1964 Title 18, Part 1, Ch 13, Sec 241-2 &245... 1 & 2

Federal Rules of Civil Procedure Rule 18(a)..........................3

Federal Rules of Civil Procedure Rule 18(b)..........................4

Federal Rules of Civil Procedure Rule 18(b) 1966
Amendment...................................................................4

Federal Rules of Civil Procedure Rule 20(b)(B).....................3

Federal Rules of Civil Procedure Rule 22(a)(1)(A)..................5

Federal Rules of Civil Procedure Rule 42(a)..........................3

Federal Rules of Civil Procedure Rule 42(a)(3).....................4

Federal Rules of Civil Procedure Rule 42(b)..........................3

LR. 38.1 Right to Jury Trial...............................................3

Case:  United States v. Price et al, Supreme Court of United States 383 U.S. 787; 86 F. S CT. 1152; 1966 U.S. Lexis 1963 Nov 9, 1965, Argued March 28, 1966, Decided

**RECEIVED**



APR 2 0 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

BERTHA M. HAMILTON
LAVELLE T. TULLIS
DEBI (TULLIS) BELL
JOHNNY W. FITT
JESSIE GRAY JR.
RUTH L. JOHNSON
ROGETTA T. ODHAMS
JESSIE LEE WADE
CAROLYN A. DAVIS
DENNIS M. EGELSTON
RICHARD MITCHELL
KAREN S. DAVIS

**6:10cv0664**

: Date Filed:_____

VERSUS

DR. SHIVANI NEGI
MS. BARBARA WATKINS
DR. HOLLIS REED

---

**Monetary Damages Due to Violation of Plaintiff's Rights Under the
Civil Rights Act Title 18, Part I, Chapter 13, Section 241, 242, 245,
(action for deprivation of rights)**

---

## SECTION 1 (Pleadings)

NOW INTO COURT, comes plaintiffs Bertha Hamilton, Lavelle Tullis,

Debi Bell, Johnny Fitt, Jessie Gray Jr., Ruth L. Johnson, Rogetta Odhams,

Jessie L. Wade, Carolyn Davis, Dennis Egelston, Richard Mitchell, & Karen

Davis who state, "that we are endowed by our Creator with certain

unalienable Rights, that among these are Life, Liberty and the pursuit of

Happiness." We comprise a special group of individuals who have had their

Civil Rights violated by said Defendants. We also assert the following:

1.

Plaintiffs are of the full age of majority and is presently domiciled in the

State of Louisiana and in the Western District of Louisiana or have a Duly

appointed Agent in the State of Louisiana.

2.

This Honorable Court has jurisdiction over this matter pursuant under

**C.R.A. 1964 Title VII Equal-Employment Opportunity - 42  USC 21, &**

**C.R.A. 1964 Title 18 Part 1, Chapter 13, Section 241, 242, 245** (action for

deprivation of rights), and the **1st Amendment of the Constitution** of the

United States of America, "establishes the right to petition the government

for redress of grievance." The **Civil Rights Act of 1983** clearly state:

"Every person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any **citizen** of the United States or other

person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress,...". Each plaintiff is a citizen of the United States and has the right to seek redress in Federal Court. Each Plaintiff has the *right to Jury Trial under LR 38.1.* Plaintiff's also violated KKK Act 1871.

3a.

Plaintiffs have the right to Joinder of Claims under *Rule 18(a)* of the **Federal Rules of Civil Procedure,** "A party asserting a claim, counterclaim, cross claim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party. Plaintiffs meet the criteria under *Rule 20(b)* **Federal Rules of Civil Procedure** any question of law or fact common to all plaintiffs will arise in the action. (The one common fact throughout all these claims is the fact that all plaintiffs were harmed by the same physician **(Dr. Negi)** or said superiors **(Ms. Watkins & Dr. Reed)** who have protected this physician and harmed other defendants by these same superiors).

3b.

Plaintiff's claims are so interdependent and intertwined that separation of trial under *Rule 42(a)* **Federal Rules of Civil Procedure** would be a miscarriage of justice. Defendant's actions must be held in proper context to expose the full nature of the defendant's transgressions. Separate trials would also incur unnecessary expense on the State. *Under Rule 42(b)*

-3-

**Federal Rules of Civil Procedure** plaintiff's are entitled to a Consolidation and separate trials would again add unnecessary cost to the State due to the fact all the plaintiff's qualify under the pauper status.  **Rule 42(a)(3) Federal Rules of Civil Procedure *Consolidation*** is also required due to cost.  Rule 42(a)(3) states "issue any other orders to avoid unnecessary cost or delay."  *Any separation of trial or issues would be directly opposite from what the joinder rule was created for.*  Any prejudice that may be brought about due to exposing of defendant's actions are a direct result of their actions and must not be protected by the Court through severing of either issues or cases.

3c.

Plaintiffs also assert under **Federal Rules of Civil Procedure *Rule 18(b) Joinder of Contingent Claims.***  A party may join two claims even though one of them is contingent on the disposition of the other; but the court may grant relief only in accordance with the parties' relative substantive rights. In particular, a plaintiff may state a claim for money and a claim to set aside a conveyance that is fraudulent as to that plaintiff, without first obtaining a judgment for the money.  This joinder claim is also permitted under the *1966 Amendment.*  "The liberal policy regarding joinder of claims in the pleading extends to cases with multiple parties."

-4-

3d.

Under **Federal Rules of Civil Procedure** we the Plaintiffs claim our

rights under **Rule 22(a)(1)(A)** *By a Plaintiff.* Persons with claims that may

expose a plaintiff to double or multiple liability may be joined as defendants

and required to interplead. Joinder for interpleaded is proper even though:

> (A) the claims of the several claimants, or the titles on which their
> claims depend lack a common origin or are adverse and
> independent rather than identical; or

3e.

Each plaintiff is a member of a *particular group of individuals* who

have had their *Civil Rights* violated by said defendants in this case. Since

each member is a citizen and a member of this particular group of

individuals the **Civil Rights act of 1983** does apply.

Each plaintiff has either been harmed themselves, and or had

immediate family members harmed through deliberate willful acts of each

defendant. All have suffered from either one or all of the following:

> loss of consortium, placed under unnecessary stress, and or loss of
> wages or income which forced them to endure unnecessary hardships
> imposed upon either themselves and or loved ones and still suffer as a
> result of these deliberate willful acts of commission and or omission
> committed by said defendants.

4.

Each Plaintiff maintains they have a right to sue under the *1ˢᵗ*

*Amendment of the Constitution* that ensures each citizen the right "to

petition the government for redress of grievances." Each plaintiff also asserts the government has a most particular burden itself due to the fact that said defendants are government employees who have been complained about to proper authorities with no relief. The fact that complaints have been made against Dr. Negi and her supervisors who took no corrective action this action has now met the criteria for intentional damages and surpasses any need for Medical malpractice to prevail although some of the parties filing have been victimized to the extent that Medical Malpractice has occurred. **Please note this is not a Medial Malpractice Suit.**

5.

That each Defendant had particular powers granted by the Veterans Administration and their Oaths as physicians and knowingly did commit deliberate acts of omission or commission working together in concert and knowing conspiracy to deny each plaintiff not only their right to Pursuit of Happiness but also did knowingly and deliberately do harm to each plaintiff and or each immediate member of their family causing unnecessary physical, mental, and or monetary harm.

6.

That each defendant did through acts of conspiracy did cooperate to cover up these acts of omission and or commission and violated certain

-6-

parts of *Title 18, Part 1, Chapter 63 MAIL FRAUD.*

## SECTION II
### A. Proof of Pattern of Maltreatment of Veterans/Family Members

#### 1. Proof of Maltreatment Lavelle Tullis

In **Exhibit D**, Barbara Watkins was attempting to cover up the fact

that VA Alexandria Mental Hygiene Department had initiated a policy to

remove all veterans from benzodiazepines as a treatment for Post-traumatic

Stress Disorder. Mr. Tullis, a Viet Nam veteran, has a primary diagnosis of

Post-traumatic Stress Disorder with a cardiac dysrhythmia component. In

compliance with the newly initiated policy, the VA-Alexandria psychiatric

department stopped prescribing Ativan for the treatment of Post-Traumatic

Stress Disorder which resulted in the cancellation of Ativan for Mr. Tullis

although he had a separate diagnosis that required Ativan for proper

management. Mr. Tullis informed the Psychiatric Department, Dr. Aguirre

that his Ativan was prescribed as part of the management of his heart

condition. Dr. Carroll, Cardiologist at VA-Alexandria, was consulted and he

concurred that Ativan was an appropriate medication for the control of Mr.

Tullis cardiac condition. Mr. Tullis received an appointment to see a

different pre-selected cardiologist in Shreveport-VA who was willing to

refute Dr. Carroll's opinion. Ms. Watkins called Dr. Carroll into her office

-7-

and after she met with him he told Mr. Labbe and Mr. Tullis that,

**"I can no longer help you, I've been neutered."**

This information was related to Mr. Labbe and Mr. Tullis as Dr. Carroll was leaving Ms. Watkins office.

The untrue statement made by Ms. Watkins in **Exhibit D** about Mr. Tullis never requesting Ativan (Benzodiazepines) for his cardiac condition is completely exposed through her meeting with Dr. Carroll about the medication request and Dr. Carroll's concurrence with the patient.

There was a protest by Louisiana Veteran Advocacy Group to expose the wrongful policy of stopping veteran's treatment for PTSD with benzodiazepines. Immediately after the protest, Mr. Labbe complained to Jackson-VA, Chief of Staff, Dr. Enderle, who agreed that certain veterans should receive benzodiazepines as treatment for Post-Traumatic Stress Disorder. Dr. Enderle had Mr. Labbe to meet with Dr. Hollis Reed, Chief of Staff at VA-Alexandria, to correct this problem. Mr. Labbe, Mr. Tullis, and Mr. Richard Mitchell (another veteran whose PTSD treatment was affected) met with Dr. Hollis Reed and a staff member from Jackson-VA. The end result was the <u>policy</u> **was** reversed. The VA Alexander took away Mr.

-8-

Tullis's Psychiatrist and medications and has never been treated since then.

## 2. Proof of Maltreatment Johnny Fitt

This exact same policy of the hospital removing veterans off of

benzodiazepines resulted in another veteran, Mr. Johnny Fitt, losing the

opportunity to continue seeing a psychiatrist. Mr. Fitt also complained

because his Dr. told him he lost his teeth due to medication and VA Alex

refused to replace them. At one time, Mr. Fitt was treated by Dr. Raoul

Reichard, Psychiatrist, but no other psychiatrist was assigned when Dr.

Reichard was fired. He was directed to an internist, Dr. Carlos Torrez who

prescribed his psychiatric medication. The fact that Mr. Fitt was not being

treated by a psychiatrist resulted in his "disability request" being denied by

the regional office because being seen by a psychiatrist is a prerequisite to

having a mental disability upgrade. Mr. Fitt has only just been given a fee

base card, allowing him to see a private psychiatrist, due to actions taken on

his behalf by Louisiana Veterans Advocacy Group. Mr. Fitt awaits a

decision to receive a disability upgrade today.

Prior to his dismissal from VA-Alexandria, Dr. Raoul Reichard had

clinically determined that Mr. Fitt was un-employable due to Post-Traumatic

Stress Disorder alone. This fact is significant because Mr. Fitt is only

receiving a 10% award for his PTSD. Dr. Riechard had also given similar

diagnoses to Mr. Ludger Cromier, Richard Mitchell, and other veterans with

PTSD. Dr. Riechard actions were contrary to VA-Alexandria policy of

keeping veteran's service-connected medical awards as low as possible.

**3.**
### Proof of Pattern of Maltreatment of Floyd Hamilton, Jr.

I am also submitting a copy of a letter from Dr. Hollis Reed which

makes the following statement about World War II veteran, Floyd Hamilton,

Jr. by Dr. Reed **(Exhibit E )**:

> "His extubation and transfer to 7CS were appropriate and medically
> indicated and his management on 7CS was also appropriate."

It is my position that this statement also is deliberately misleading and was

created to protect Dr. Negi for her maltreatment of this veteran.   Dr. St. Cyr,

primary physician for this veteran, had a medical plan to keep him in ICU,

on an antibiotic drip, and intubated him until his potential for aspiration was

addressed properly. Dr. St. Cyr commented that the veteran was breathing

some on his own but he would leave him intubated in order for him to get

stronger.  Dr. Marc St. Cyr stated he also checked with the respiratory staff

and they agreed. See **(Exhibit T)**  Dr. Negi, on weekend duty, took Mr.

Hamilton Jr. off the respirator despite his low Glascow Coma score of 7, a

value below the recommended level to extubate a patient **(Exhibit B.2)**.

-10-

Mr. Hamilton, III spoke with Dr. Negi about Dr. St. Cyr's medical plan to keep his father's lungs breathing and clear of fluids in case he aspirated. Dr. Negi replied,

> "Who told you something as crazy as that", I never heard
> anything as crazy as that; I never heard of such a thing."

In this same phone conversation Dr. Negi asked him why he wanted his father fully coded. She told him that his father was 84 years old and had had a good life so why did he want him coded. Dr. Negi not only put in orders to take Floyd Hamilton, Jr. off the breathing machine, but also off of antibiotics and had him taken out of ICU (**Exhibit B2**: Shivani Negi progress note, signed: 9-24-06 12:59).

A second physician, Dr. Akwa, who evaluated Mr. Hamilton, Jr., wrote:

> " pt on Primaxin and Avelox IV. all discontinued before transfer to
> floor still has leucocytosis, no rpt wbc. Pt is full Code. Gurgly
> Respiration, Lungs - Harsh B/S with Diffuse Rales Aspiration
> Aspiration pneumonia(**Exhibit B1**: Dr. Akwa dated 9-24-06 ).

Dr. Negi was the transferring physician who wrote:

> "will d/c abx  *<discontinue antibiotics>* and see how he does off them
> and remove central line pt is stable for transfer to floor" (**Exhibit B1**)

This was not the only time that Dr. Negi deliberately harmed Mr.

-11-

Hamilton, Jr.  On January 2, 2007, after Mr. Hamilton III had already put in

a formal Order to have Dr. Negi not work on his Dad, she did.  The nurses at

ICU told the son, while he was visiting his father, that he had a phone call.

Dr. Negi was the caller and stated that Dr. Marc St. Cyr no longer worked at

VA-Alexandria and then she said, "I got your Daddy back" and hung up.

When the son returned that night to be with his Dad, he found that his father

was no longer in ICU.  Shortly after, Dr. St. Cyr came into the hospital,

when Mr. Hamilton III saw him, he asked,

> "Why are you here, Dr. Negi said that you do not work here
> anymore". Dr. St. Cyr said "I was sick and took off some days,
> but I still work here."

If this administration had not been protecting Dr. Negi's negative acts

against patients, she would not have dared to ignore an order for her NOT to

resume caring for Mr. Hamilton Jr, and LIE to the son about the primary

care physician no longer working at VA-Alexandria.  Note that this incident

describes the second time that Dr. Negi took Mr. Hamilton, Jr. out of ICU.

(**Exhibit B** Affidavit Floyd Hamilton III)

### 4.
### Proof of Maltreatment of  Dennis M. Egelston Sr.
Affidavit from Dennis M. Egelston, Sr.: **Exhibit F**

Dr. Torres from the Jennings outpatient sent me to the VA in Alexandria

-12-

because she found MRSA. The emergency room Dr. put me on bagged IV antibiotics. The first time I saw Dr. Negi she took me off the bagged antibiotics and started me on steroids. I told her that I was **diabetic** and could not be placed on **Steroids**. This did not stop her even though I pleaded with her not to. She told me, **"I am the doctor and you are the patient and I will do what I want to."** My blood sugar shot from about about 180 to over 500. Dr. Chen came in and put me back on bag I.V..

In 2007 I was sent back to the Alexandria hospital diagnosed with MRSA again. Dr. Negi came in on duty the first weekend after the toe was amputated and yelled into the room that **she was taking me off the bag and** would put me **back on oral medication**. I had to remain on oral antibiotics until my regular physician, **Dr. Ghangi**, came back and put me **back on IV..**

I feel that if Dr. Negi did not interfere that my condition may have cleared up and not gotten as bad as it did. The only time the VA Alexandria took a swab of my infected toe was the last time I was hospitalized there and they did not wait for the results to see if the MRSA was cleared before discharging me. This treatment was different from that at the American Legion Hospital in Jennings, Louisiana where I was kept on IV antibiotics and never taken off until results of the swab of my toe came back to prove

-13-

MRSA was gone . **Dr. Negi stopped my IV antibiotics both times at VA-Alexandria.**

## 5.
### Proof of Maltreatment of Barbara Lavine
Affidavit from Daughter Rogetta T. Odhams: **Exhibit G**

Mrs. Barbara A. Lavine walked into the VA hospital in Alexandria on a Saturday morning at 11:30 A.M..  I spoke to mother on Sunday afternoon and again she seemed fine.  I called again on Monday morning and learned she was in ICU.  I spoke to her and she did not know what was going on.  I left word with the ICU nurse to have Dr. Negi call me.  She returned a call about four hours later and told me my mother was dying and there was nothing she could do for her.  I left home and got a phone call from Dr. Negi asking me to sign a DNR before I even got to the hospital.  I refused.

I got to Alexandria Tuesday morning and did not get to see Dr. Negi until about 8:30 that morning.  She came in the room and said my mother was dying.  I asked her to speak to me outside because I did not want to have this conversation in front of my mother. I asked her why did my mother's health deteriorate so fast.  I also told her I wanted my mother off the morphine.  After the morphine was removed my mother was no longer hallucinating and she began to sit up and eat again.  The nurses on ICU were

-14-

amazed at her recovery after the morphine was stopped. I did some research and asked Dr. Negi to put my mother on dialysis since Dr. Negi told me both my mother's kidneys and liver was gone. Dr. Negi told me dialysis was not available at Alexandria. I found out this was a lie. Dr. Negi also told me she had submitted paperwork to send my mother to Houston because dialysis was available there. I also learned this was a lie. I then called Houston to try to speed the paperwork up and found out that no such paperwork was sent. I gave the man the number in Houston and he called ICU to get the process started. Dr. Negi found out and came to me **irate** and said I never should have called **and I should let her do her job**. To the best of my knowledge no dialysis was done while my mother was in Alexandria and to this day I do not know why Dr. Negi was lying to me.

The Houston VA was exactly opposite from Alexandria. A nephrologist told me my mother's kidneys were perfect. The doctors started her on platelets immediately. Alexandria asked if she had fallen because they did a CAT scan and found fluid on her brain. Houston ran the exact same test and found nothing. **Houston agreed that my mother should not be put on morphine because her liver could not process the drug.**

My mother passed approximately three weeks after getting to Houston. I

-15-

do know that the morphine Dr. Negi put her on was not called for and if I had not forced her to remove the morphine mother would have continued to hallucinate and would have probably died much earlier.  I feel that the **damage done to her by Dr. Negi hastened her death.**

**6.**

**Proof of Maltreatment of Michael Sampson**
Affidavit for Ms. Jessie Lee Wade: **Exhibit H**

My son Michael Joseph Sampson was sent to ICU after being housed in the VA psychiatric ward.  I had problems with Dr. Negi from the very beginning.  My son was on the respirator and had a feeding tube.  Shortly after meeting Dr. Negi she asked me to sign to pull him off the respirator.  **I refused to do this and she never spoke to me again**.  I saw that Michael had Gangrene in his feet and tried to get her to treat him and she refused.  I also saw that Michael had bed sores in his back and irritation around the feeding tube. Whenever I talked to the nurses to get treatment of these areas they told me I had to talk to Dr. Negi.

I left messages and tried to talk to Dr. Negi on the hall after I refused to allow her to pull the plug but she refused to talk to me even after I made numerous appointments at the desk with many different nurses.  I made complaints about the bed sores, feeding tube and feet daily and Dr. Negi

-16-

refused to put out any orders to treat any of these illnesses.  My son just lay in that bed and rot.  I did not once see any treatment other than feeding. This feeding tube stayed dirty, unclean, infected and untreated since the day I refused to allow Dr. Negi to pull the plug to let my son die.

### 7.
### Proof of Maltreatment of Clinton C. Johnson
Affidavit for Ms. Ruth L. Johnson: **Exhibit I**

My husband was first treated at Alexandria VA for prostate problems by Dr. Reed.  He developed cancer of the pancreas  and was allowed to come home before further treatment.   At home he told me **he did not trust Dr. Negi** and wanted to go to Overton Brooke in Shreveport.  We did not have proper transportation and was only able to get him to Alexandria.  He asked Dr. Negi to ship him to Shreveport to have a drainage tube put in.  She refused and he asked me to call her.  I had to call about two or three times before I could speak to her and she told me she would send him to Shreveport on Monday or Tuesday and they would put the tube in.  **I finally called back and learned she did not keep her word and had the tube put in in Alexandria.**

I kept going back to the ICU through March and April and kept making request to see Dr. Negi but she refused to talk to me.  **Dr. Negi first asked**

-17-

me to sign a **DNR** in the last part of March.  This was done by phone.  I had

been requesting to meet with Dr. Negi prior to my husband going into the

ICU.  I kept requesting to meet with Dr. Negi all through the month of

March when staying with my husband in ICU.  **She still did not meet with**

**me to discuss his illness or treatment.**  My husband told her prior to his

going to ICU that I had breast cancer and had one breast already removed.

I asked the nurses to page Dr. Negi first and she did not come.  I met a male

Dr. on the floor and thought he was Dr. Negi and he told me he wasn't and

he had her paged and she still did not come to meet with me.  ***Dr. Negi's***

***refusal to meet with me and discuss my husbands illness and treatment***

***put me under abnormal stress, aggravation.***  I did not know how close my

husband was to dying.

　　She finally met with me during the last week of my husband's life.  She

kept badgering me about signing a DNR.  She kept telling me I was being

selfish and cruel and I needed to sign a DNR.  ***Dr. Negi had me in tears and***

***my sister got angry and told her to back off and leave me alone.***  My sister

told her I could not do this at this time.  Before she left the room Dr. Negi

told me in a rough tone of voice that before I left I needed to sign this

statement (DNR).

-18-

I went back to Leesville and Dr. Negi called me every day to sign a

DNR, even the same day I left the hospital.  She would call two or three

times a day.  Finally at 3:00 A.M. one morning she said my husband was no

longer breathing and they put him on a respirator.  She told me to relax and

he was stable and that I could come and see him.  I had been there on

Monday and Tuesday and asked to see her and she still did not come.  I even

had her paged and she still did not come.  I told her that I had been there

that Monday and Tuesday and did not have any money.  **She said I'll send**

**you fifty dollars for you to come in and sign the paper.**  I picked the fifty

dollars up from Don's Hallmark in Leesville.

My sister and I went back and finally Dr. Negi came in and saw us.  I

told Dr. Negi to please not pull the plug unless a family member of his was

present.  My daughter was coming in from Port Arthur, Texas and I begged

her not to pull the plug until my daughter got in to see her father.  My

daughter called the hospital and asked them to wait because she was only 45

minutes away.  **When my daughter got to the hospital they had already**

**pulled the plug.**

My daughter called me on the phone and told me they told her that her

father was dead and she could not see him.  This incident affected my

-19-

daughter so badly we have not been able to reach her since the funeral.   Dr. Negi was hard to deal with by constantly pressuring me to sign a DNR but I think this act **of not letting my daughter see her father when she was only 45** minutes away was the most horrid and destructive of all her acts.   I hope my daughter is still alive.   **I know Dr. Negi contributed to her mental state also.**

**8.**
**Proof Maltreatment Charles Davis**
Affidavit from Carolyn A. Davis : **Exhibit J**

The first negative incident involving Dr. Negi and my husband was involving his being transferred from the Alexandria VA to Cabrini Hospital as requested by me.   Dr. Perez had made arrangements for Mr. Davis to be treated by him at Cabrini.   **Dr. Negi called Dr. Perez and refused to allow the transfer contrary to my wishes.**

The next incident was involving my husband loosing weight due to him not being able to keep food on his stomach.   I knew my husband was loosing weight because I bathe him every day and he kept getting lighter.   **I complained to Dr. Admal but got no results.**   I officially requested Dr. Negi not be allowed to treat my husband but had no choice when he was put in ICU because she controlled ICU.

-20-

At 8 o'clock one morning the social worker called me and asked me to come in. She and Dr. Negi were in my husband's room and wanted me to sign a **DNR**. I told them to ask him because he could speak for himself. After they explained to him what a DNR was he stated, **"I want to live."** He took his time and spoke these words clearly. I do not know why she wanted me to sign the DNR when my husband could speak for himself. Dr. Negi told me as we were walking out of the room that she did not know why people want to let people lie there like that. **I could tell she was angry from her tone of voice. Dr. Negi ordered him to be taken off ICU and put in a room.**

This room was way down the hall. I asked Mrs. Fields why was he put so far from the nurses station because he was still throwing up his food. For the next week my husband was not fed anything because I was there every day and he also told me they fed him nothing. Dr. Negi came in the room and reported he did not throw up. **I told her he could not throw anything up because he was not fed anything.** I also asked her to at least give him some nutrients by IV. Shortly afterward a nutritionist came in because they knew I was staying with him all day and night.

My daughter Tiffany and I was going to my husband's room when we

-21-

heard him yell "somebody help me". We went in the room and a male nurse was there. I asked him what was wrong and he said somebody hit him. I asked him who and he pointed to the male nurse. I reported this to Ms. Hayward, the nurse in charge, and she made no written report. I reported to another nurse and finally a meeting was held and the result was the male nurse was not allowed back into my husband's room.

I finally told them that **if my husband died I would put it on Channel 5 news** because he was throwing all his food up and they took no action to find out what was wrong. **They immediately transferred him to Houston.** When my husband got to Houston they put him on an antibiotic and he immediately got better. He was able to hold his food, and began to feel and look better. I talked to a Dr. in Houston and explained the problems in Alexandria and he told me they had him on the wrong antibiotic. He also said, **"They couldn't figure this out".** Houston was forced to ship him back to Alexandria.

My husband was placed back in a regular room in Alexandria. Within a couple of days he was throwing his food up again. He kept getting worst and was put back in ICU. He was only given one IV bag. The whole time he was in ICU this time I did not see any antibiotics or any other medication

given through this one IV bag. Someone in the nursing home in the hospital called and asked if I had signed a DNR and I told them no. I know that after I refused to sign the DNR Dr. Negi got worst. Every person I saw come into ICU Dr. Negi would tell the family members in front of everyone the patient was going to die. She would say this in front of anyone. She did not respect anyone's privacy. Dr. Negi acted as though she was God. The day my husband died I prayed to God. **Dr. Negi asked me how could I call on God.** I told her that I grew up believing in God and I will die believing in him because this is the only help I know.

### 9a.
### Affidavit for Jessie Gray, Jr. and Mary Ann Gray: Exhibit A

In January 2008 I began having back pain and went into VA Alexandria and placed under the care of Dr. Negi. I told her I was on **aspirin** due to previous blood clots and heart surgery from clots in Shreveport VA. I also told her that I was on Coumadin before but had problems with it and the aspirin was to prevent blood clots. **Dr. Negi went against my wishes and took me off of aspirin.** I was discharged by her and told by her that she did not find out what was wrong with my back. I argued with her that I was in severe pain and it was wrong to discharge me without knowing what was wrong. Mr. Floyd Hamilton III was in the area and heard this argument.

Prior to discharge medical documents showed:

> (a) A lytic mass was visualized on the thoracic vertebrae at T9 with soft tissue mass extending beyond the vertebral cortex. The mass measures 4.4 cm by 3.6 cm in size; Impressions: "Lytic mass of the T-9 vertebrae concerning for metastatic disease; Imaging guided biopsy of the T9 vertebrae may be indicated." (**Exhibit A-1** and **Exhibit A-2**)

> (b) Radiologist's review of the CT scan of the chest indicated a "compression fracture of thoracic vertebra at T8, probably metastatic. A total body bone scan might still be useful." Addendum: "Compression of T8, probably metastatic" (**Exhibit A-3**)

Despite all the radiographic tests ordered by Dr. Negi, she discharged me without following diagnosis made by radiologists and told me **she did not know what was wrong with my back.** I resisted leaving the hospital and she became very loud telling me that I had to go. I did not want to leave because she did not find out what was wrong with him.

This argument was so loud that others heard it while visiting their relatives and some came outside to investigate. Mr. Hamilton, III heard her arguing with me when she was putting me out of the hospital. (**Exhibit B Affidavit Floyd Hamilton III**)

Approximately 4 or 5 days after discharge, I had severe chest pain and told my wife to take me to Rapides General because I did not want to deal with Dr. Negi. X-rays found blood clots in my lungs. **I was told by Dr.'s**

-24-

**at Rapides that the fact Dr. Negi took me off of aspirin either caused or contributed to my blood clots in the lungs**. I also told them she discharged me without finding out what was wrong with my back. I was immediately sent to a specialist who found that I had a cancer on T-9 vertebrae.

My wife called Dr. Negi and told her that I was in ICU at Rapides with blood clots in my lungs. My wife was also at the nurse's station when Dr. Negi called the nurse at Rapides General Hospital and asked if they felt that her taking me off the aspirin had anything to do with his blood clots in my lungs. **The nurse at the station relayed Dr. Negi's call immediately to my wife.**

I got a set of medical records from VA-Alexandria printed April 2, 2009. I got another set of records from the VA hospital that was printed on April 20, 2009. We found information in the new set of records (April 20, 2009) different from the first. Changes were made stating things that were never done. One statement found in the altered records has Dr. Negi stating:

> "Spoke with Pt at home informed him of bone marrow Bx scheduled for 2-4-08 at 9:30 AM explained that need more info before going to see oncologist so med onc rad onc appt cancelled, needs bone marrow and will F/U with results once available." (**Exhibit A-3**)

Also found in these records was what we consider to be Dr. Negi trying to

-25-

justify <u>not</u> giving me an MRI:

> "Pt could not undergo MRI due to presence of shrapnel in knee"
> **(Exhibit A-4).**

An open air MRI could have been ordered for me which would have not included my lower body since my problem was all above my waist. I was never offered or told about an MRI the whole while that I was in the VA-Alexandria hospital.

These acts, by **Dr. Negi** at VA-Alexandria Hospital, have caused me **bodily harm and shorten my life.** It has also caused me mental anguish including thoughts of **suicide and homicide.** I am also aware of and will submit evidence of procedures put in place to cover up deliberate actions that deviate from medical standard of care and good ethical practices taken by VA-Alexandria hospital physicians and administrators that have resulted in veterans being improperly treated.

### 9b.
### History of Documented Medical Diagnoses Available to Dr. Negi at the Time of My Admission to VA-Alexandria January 2008

1. <u>Stroke (CVA)</u>: Left side numbness, left eye vision weakened and left facial droop (Diagnosed 1999)

2. <u>Puritic Disorder</u> Diagnosed 10/01/04) This diagnosis should have negated VA physicians from placing me on Coumadin necessitating my getting aspirin as an anticoagulant.

-26-

3. Right upper pole <u>Thyroid Cyst</u> measuring 2.0 cm in diameter (Diagnosed 4/20/05)

4. <u>Bilateral Adrenal Adenomas</u> (tumors) (Diagnosed 4/4/06)

5. <u>Left Breast swelling with pain</u>, complaint documented 1/08/07 (despite being extremely abnormal for a man, no follow up investigation or care followed)

6. <u>Severe Headache /Migraines</u> treated with Gabapentin  4/14/07 (previously diagnosed as migraine/   cluster headaches.(There were multiple failed treatments, only Gabapentin minimized headache frequency. This history should have alerted physicians to look for underlining cause)

Although this information was available to Dr. Negi through computer, and she ordered a chest X-ray at admission which showed a 3.4 x 4.0 centimeter mass on thoracic vertebral (T9) with the radiologist stating that the lesion was probably metastatic, no correlation or cumulative evaluation of symptoms and objective data and their significance with respect to the progression of Multiple Myeloma was ever made.

**The most important fact about this data and argument is her forcing me out of the hospital after I pleaded with her to not do so because she still had not found the cause of my pain or treated me for whatever illness that I came to the hospital for.**

**Another most significant indicator of her lack of care is shown by**

-27-

her removing me from aspirin despite me explicitly giving her a history of having had clots in my lungs and diagnosed with blood clotting problems and a need for anti-coagulants. I told her that I had been on Coumadin but could not tolerate the side effects. This withdrawal of aspirin resulted in major blood clots collecting within my lungs requiring hospitalization and heparin therapy at Rapides General Hospital. My hospitalization at Rapides General Hospital occurred within one week after Dr. Negi threw me out of VA-Alexandria Hospital.

At Rapides General, I told my treating physician about my severe back pain as the reason for the initial admission into the VA-Hospital. Their evaluation revealed the same 3.4 x 4.0 centimeter mass on T9 and they immediately biopsied and removed T9 vertebra completely. I know that had Dr. Negi at least provided me with minimal care during my stay in VA-Alexandria hospital, this drastic step may have been avoided. Please note that Dr. Negi ordered the Chest X-ray on the say of my admission to VA-Alexandria that showed the 3.4x 4.0 centimeter mass on T9 as noted in the radiology report "which is probably metastatic" (Exhibit A.1).

## 10.

Mr. Richard Mitchell is another veteran who had his benzodiazipine

wrongfully taken by the physicians at the VA hospital Alexandria.  He was kept off of this medication and VA Alexandria issued an arrest warrant for him going into the Emergency Room when he had a panic attack due to lack of proper medication.  See exhibit's **A 58-A 60**.

## 11.
### Karen Davis

Mr. Louis M. Davis had hypertension in service.  He had a stroke in 1990 and was comatose for 3 months.  Due to being out of finances Mr. & Mrs. Davis sought help from the VA Hospital in Alexandria in December 1991.  Mr. & Mrs. Davis continually requested VA accept his private medical records to properly assess his current health status.

Mrs. Davis made complaints to Ms. Barbara Watkins, Dr. Hollis Reed and Mr. Charles Parvin stating it is impossible for the physicians to properly understand her husbands current physical situation without looking at his past medical history.  Mrs. Davis sent three letters to Ms. Watkins and Dr. Reed about this same problem and proper care for her husband to no avail.  She also sent a letter to VISIN 16 complaining about this problem and the improper treatment of her husband.

On May 1, 2008 Dr. Richey, a contracted Urologist, stated he could do nothing more for Mr. Davis and Mr. Davis should be shipped

to Shreveport V.A. to have his kidney stones removed. On May 24, 2008 Mr. Davis was taken from the nursing home and put in Alex hospital, yet despite Dr. Richey's request he was not sent to Shreveport V.A. to have the stones removed.

Mr. Davis was hospitalized through the emergency room on June 7, 2008 yet once again he was not shipped to Shreveport VA to have his kidney stones removed. Finally on July 3, 2008 Mr. Davis was again admitted to the hospital through the Emergency Room. Dr. Roberts was the admitting physician and Mrs. Davis pleaded with him to allow her to take Mr. Davis to any other hospital to get the stones removed. Dr. Roberts told Mrs. Davis that her request was unwarranted and if she did not be quit complaining he would call the Security Department.

Dr. Negi took Mr. Davis into the ICU, looked at his charts and found that even though Mr. Davis had severe kidney stone blockages, and request had been made since May 1, 2008 to have this patient sent to the VA hospital in Shreveport to have the stones removed she refused to follow this request. Dr. Negi gave Mr. Davis **50 mgs. of Demerol** and ordered I.V. fluids. When she made this order the nurse on duty Mr. Johnathan Ponteneou cried because he knew what Dr. Negi

-29a-

was doing.  **See Exhibit's A-61 - A - 64.**

Less than 16 seconds after my husband died on July 8, 2008 Dr. Negi asked me if I wanted an autopsy performed on my husband.  I told her yes, but I did not want it done here.  **LSU medical Center in Shreveport did the autopsy and found that my husband died from blocked urethera.**  *Dr. Negi lied on the death certificate and stated that my husband*  died from hypotension and bradycardia.  **Dr. Negi finally did comply with the request for my husband to be sent to Shreveport by Dr. Richey on May 1, 2008.  The only problem was that she waited until her treatment of him already killed him.**

*All of the people listed in this suit have one thing in common.  This is the fact that the people in charge at the hospital used the police force as a weapon to ensure their wrongs would be complied with.  Mrs. Davis was told to stop complaining or she would be arrested.  Mr. Tullis had the hospital police called and forced him to leave the grounds when he tried to get his heart medication.  Ms. Bell was brought from her office to the hospital police station where they tried to intimidate her into telling who may have assisted her in the E-mail she sent to hospital staff.  Mr. Richard Mitchell not only had the police*

*department called; they issued an arrest warrant for him. Mr. Labbe and Mr. Hamilton was told by the hospital police they had to leave the grounds and could no longer issue summons. Every other patient and family member knew the doctors and nurses had the hospital police force at their disposal and that no matter what wrong was being done to themselves or family members this police force was the ultimate authority that could be called upon at any time to either throw them off of the hospital grounds or have them incarcerated.*

Staff meetings were held by the ultimate authorities at the hospital on a regular basis. These meetings were ruled by Ms. Barbara Watkins as Hospital Administrator and Dr. Hollis Reed as Chief of Staff. Many complaints had been made against Dr. Negi about her either verbally or physically attaching subordinates or abusing patients under her care. Dr. Negi came in on Weekend duty and went against orders by treating physicians and overruled their treatment plans resulting, in harm to patients, brain damage and or death. Any one with common sense knows that if a mans kidneys are blocked and this blockage is left in place for months the ultimate outcome will be death. **Ms. Barbara Watkins, Dr. Reed and Dr. Shivani Negi are equally responsible for**

-29c-

the deliberate maltreatment and brutal treatment of patients under their care.  **THIS JURY MUST NOT ALLOW THEN TO GO UNPUNISHED.**

## SECTION III
### Proof of Mail Fraud to Cover Up Maltreatment of Affected Population

1. Letter Barbara C. Watkins to Paul G. Labbe **Exhibit D** dated March 7, 2007 page 2, paragraph 3, Sentence 1, "At no time during any mental health Interview did Mr. Tullis mention that he wanted to use ativan to treat a heart condition." This letter itself as was explained earlier was only the first step to try to take away a man's heart medication because he had the audacity to request the same medication for his heart this same hospitals heart specialist put him on years earlier. **Exhibit E**

2. Letter Dr. Hollis Reed dated March 13, 2007 paragraph 5, "His extubation and transfer to 7CS were appropriate and medically indicated and his management on 7CS was also appropriate."

**(Mr. Hamilton, Jr. had aspiration pneumonia that required close monitoring and intubation as indicated by a Glascow Coma Score below a cumulative value of 8.)** *Even is this statement was true, which it was not, this man took no appropriate action to sanction Dr. Negi the second time she removed Mr. Hamilton from ICU.*

-29d-

3. **Exhibit C** Letter from Barbara Watkins to Congressman Rodney Alexander stating, "Glascow Coma Scale is not used for determining the need for breathing support". *The Glascow Coma Scale is one of the major tools used to extubate a patient.*

## SECTION IV
### Proof of Conspiracy of Maltreatment and Intimidation of Employees to Maintain and Protect Defendant's Ability to Mistreat Patients/Family Members and Employees

### 1.
### Documented Proof of Coercion of Patients/Family Member

One of the tactics used by Dr. Negi to be able to limit the cost of the ICU unit under her domain was to brow beat patients/family and force them to sign DNR's under duress either by intimidation **(All Affidavits)**, coercion or refusal to either communicate and or deny treatment **(Exhibit I)**. Whenever Dr. Negi became aware that her maltreatment of a patient caused severe damage to a patient who needed care at another facility that would reveal her maltreatment she altered the records to try to alleviate her guilt.

**(Exhihibit Jessie Gray Jr.)**

### 2.
### Direct Lies to I.G. to Cover Up Maltreatment of Veterans/Family
-30-

A. Inspector General's "Executive Summary" issued February 14, 2008 paragraph 2, sentence 3 states:

> "The patient suffered several strokes and had two episodes when he stopped breathing twice." (**Exhibit Q**)

This statement is a false statement of fact that could only have been provided by the same group of conspirators.   The Office of Inspector General (OIG) is required to investigate; it is important to point out, that when the O.I.G. made this investigation the complaining party, Floyd Hamilton III was never contacted.  *Autopsy report proved only one stroke.*

B. OIG report, February 14, 2008, page 7 under Issue 3: **Payment to Family**, paragraph 2, sentence 4 (**Exhibit Q**),

> "Physician B **sent money order** to wife **9 days after she had already agreed to withdraw life sustaining treatment**".

In **Exhibit I**, page 2, Ms. Johnson states,

> "she said well I'll  send you the $50.00 for you to come and sign the paper.  Dr. Negi called me at 3:00 am and said that my husband was no longer breathing and he was put on respirator".

Note that Mr. Johnson died one day after Mrs. Johnson signed the DNR.

**3.**

## Affidavits Proving Tactics used to Intimidate Employees

A. **Exhibit K**: Affidavit of Wanda Augustine . This affidavit proves the

maltreatment of fellow employees (nurses) by Dr. Negi. It is common

knowledge that women of the Black race will take umbrage against any

person (especially persons of another race) calling them *"black bitches"*.

Additional evidence is provided in the Affidavit, **Exhibit N** where Mr.

Vincent attests to witnessing Dr. Negi's browbeating of Dr. Chen

(hospitalist at VA-Alexandria).

B. **Tactics Used to Hire & Fire Ms. Bell for Leverage on Father.**

**Exhibit L**: Affidavit of Debi Bell. This affidavit proves the atmosphere of

retaliation and protectionism that exist at this hospital. It clearly shows how

VA-Alexandria used unapproved hiring practices to set up an employee to

acquire leverage to punish/control her father; retaliation for his complaining

about hospital actions adversely affecting veterans and facilitating avenues

for other veterans to file complains. It further proves the extent of

intimidation and violation of ethical practices used by Ms. Watkins to

advance her agenda no matter who it hurts. The following are documented

proofs that Ms. Watkins, as head of the hospital (***Don***) deliberately initiated

-32-

and carried through with her acts to punish Mr. Tullis's daughter by firing

her to continue the atmosphere of trepidation, control and intimidation of all

employees.

1. Ms. Watkins statement to Ms. Bell which expose the true reasons for firing her was confirmed by Ms. Watkins statement in a meeting with employee representative Raymond Jack. After Ms. Bell explained her dismay at being fired due to a mistake made by VA-Alexandria, Ms. Watkins replied that," your father also made a mistake." This statement by Ms. Watkins is confirmed in the letter written by Raymond Jack, Chief Steward, dated November 10, 2009 (**Exhibit R**)

2. Violation of hiring practices in order to achieve desired veil of threat to dominate employees and patients. (**Exhibit P**): Report signed by JoAnn Waterman, EEO Counselor in Little Rock, Arkansas on page 5 last paragraph, Sentence 3)

"when she received the certificate, there was only one name on the certificate that was a 10-point veteran preference".

3. Pressure used by Ms. Watkins to acquire new person in Ms. Bell's job. Ms Thrasher stated that the individual was inappropriate for the job and she did not select anyone. Ms. Watkins response was you will hire one. (**Exhibit P A-48**)

4. In an e-mail correspondences between Debi Bell and Barbara Watkins, the following discussion occurred in the order shown:

a. 7/29/09 4:30pm From Debi Bell to Barbara Watkins *Ms. Bell requests to remain in position on PTSD (Post-Traumatic Stress Syndrome) team until replacement is hired.* (**Exhibit L.1**) Please note Ms. Watkins reply is made one

-33-

minute after receiving the email from Ms. Bell.

b.   7/29/09 4:31 pm From Barbara Watkins to Debi Bell *Ms. Watkins states, "Cindy will check with Washington tomorrow and I'll let you know what I find out...*
   **(Exhibit L.1)**

c.   7/30/09 12:15pm  From Barbara Watkins to Debi Bell
   *Ms. Watkins states : "We cannot extend your time. VACO was concerned that we have kept you as long as we have already,    I'm sorry.* **(Exhibit L.-1)**

d.   7/30/09 1:15pm From Debi Bell to Barbara Watkins
   *"May I have the name and number of the person you spoke with in the Central Office?"* **(Exhibit L.1)**

Ms. Watkins actions prove she would rather allow mental patients to go

untreated and suffer possible suicides to punish this employee in order to

maintain atmosphere of fear, intimidation and control.

### Other employees involved in hire & fire of Ms. Bell

5.   Ms. Pamela Mendez was the Human Resource staff person who informed Mr. Tullis and his daughter of the *veteran's preference* and had it faxed from St. Paul, Minn. Neither Mr. Tullis nor his daughter was aware of what a *"veteran's preference "* was at the time Human Resources was suggesting that it be used to favor the hiring of Ms. Bell (Mr. Tullis's daughter)

6.   (a) Ms. Twillinger, as head of the department had to approve Mr. Tullis using his *veterans preference* in his daughter's(Debi Bell) hiring; and

   (b) Patricia Lake's supervisor had to have given Ms. Lake the order to inform Ms. Bell of impending firing facilitated at the time of her being hired using *veteran's preference*

-34-

Ms. Twillinger, as head of the department should have known every

aspect of *veterans preference* due her longevity in her position so

when her department allowed Ms. Bell to use this *veterans*

*preference.* It is our belief that, Ms. Twillinger was acting at the

behest of Barbara Watkins.

    7. **Exhibit O,** Tammie Arnold E-Mail, provides evidence of
administrative personnel acting together, in concert, to intimidate
employees through acts of harassment in violation of all ethical
standards. Tammie Arnold, Public Affairs, sent e-mails to all
employees working at VA-Alexandria on September 30, 2009
prohibiting any employee to speak to the news media on the same
day that CNN came to this area to investigate victims of VA-
Alexandria Hospital maltreatment practices.

**C.  Assault of Ms. I'keisha Logan was physically attacked by Dr.
Negi and Dr. Negi was charged and turned herself in and booked by
Rapides Parish Sheriff for simple battery.**

## SECTION V
### Procedures in Place to Prevent Filings of Patients' Complaints
The patient representative at VA-Alexandria, Jerry Gibson, is not

allowed to tell a complaining patient or family member that a complaint is

not official unless that complaint is made in writing. Mr. Hamilton was

persistently visiting the patient representative complaining without realizing

that his complaints were not being registered.  Mr. Hamilton III had been to

Mr. Gibson on at least five (5) visits before a formal complaint was written

and filed.  He learned about his need to "specifically request" that his

complaints be documented and presented to the administration only when he

asked Mr. Gibson to have a written order put in his father's medical record

to prevent Dr. Negi from treating his father.  He was informed that he had to

state that he wanted a "written complaint" filed if he wanted a response to

his complaints about Dr. Negi.  After a formal complaint was made against

Dr. Negi and a formal request that she not be allowed to treat Mr. Hamilton

Jr., the order was violated by Dr. Negi when she removed Mr. Hamilton, Jr.

from the medical ICU on January 2, 2007 (*the second time that she had*

*removed him from intensive care.*).

## ARGUMENT
### SECTION 1 (Pleadings)

Each member of the affected group had their Civil Rights violated by the

defendants actions and or inactions.  Ms. Watkins and Dr. Reed's refusal to

force their subordinates to comply with proper protocol and treat their

patients and fellow employees with common decency facilitated these

atrocities.  Their cases require Joinder and Interpleader status along with

their right to jury trial due to the commonality of them all being directly

harmed through the actions of the Defendants.  Separation of any member of

the claim would be a miscarriage of justice and violation of the core reasons

Joinder and Interpleader were established.  Prejudice must only be

-36-

considered when it outweighs the rights of the plaintiff's to prove each

element and the severity of their claims.  Each act committed by said

defendants are a matter of record, premeditated and constitutes deliberate

acts intended to physically and mentally harm the patients and family

members entrusted to their care.

## SECTION II
### Proof of Pattern of Maltreatment of Veterans/Family Members

The only way any jury may have a true insight into the depth of depravity

and callousness exhibited by said defendants is for the jury to have complete

access to all of the actions of Dr. Negi's maltreatment of each member of

this suit to acquire appropriate settlements for their mental, physical and

financial losses suffered due to her deliberate disregard for human life,

quality of life, and common decency.  Her lies to the Inspector General

along with the lies of her protectors must be exposed to acquire appropriate

relief for each member of this particular population.

## SECTION III
### Proof of Mail Fraud & Up Maltreatment of Veterans/Family Members

**Title 18, Part I, Chapter 63, Section 1349** states: "Any person who

attempts or conspires to commit any offense under this Chapter shall be

subject to the same penalties as those prescribed for the offense, the

-37-

commission of which was the subject of the attempt or conspiracy. The fact

that said defendants conspired together through untrue statements made in

conjunction with each other to hide the same maltreatment of the members

of this affected class are guilty of Mail Fraud and conspiracy.

## SECTION IV
### Proof of Conspiracy of Maltreatment and Intimidation of Employees to Maintain and Protect  Defendant's Ability to Mistreat Patients/Family Members

The hiring of Ms. Bell was a means to acquire some type of Control over

her father who advocated for proper treatment of veterans and took an active

roll in exposing the wrongs perpetrated by the Administration and Medical

Staff at VA Alexandria.  All the E-mails sent by Ms. Watkins and Ms.

Tammie Arnold proves Ms. Watkins were using her underlings to bring

about the atmosphere of intimidation and control she needed to keep

violations of patients and employees rights under her control.

The named defendants used subordinates to accomplish the

atmosphere of fear and intimidation to keep any incriminating information

from destroying their stronghold.  The head of the group, Barbara Watkins,

not only pulled the strings, but personally intimidated employees and

executed decisions that furthered her agenda shown by her punishing an

-38-

innocent employee, Debi Bell, because her father was part of an advocacy group who fights for a veteran's right to appropriate and consistent healthcare through the Veteran Affairs Health Centers. The most incriminating comment made to Ms. Bell by Ms. Watkins was her words,

"Your father made a mistake, too"

This statement was made in the presence of a union representative (**Exhibit R**). This, more than anything else, proves that Ms. Bell was set-up by the Veteran Affairs Administration when they knowingly arranged her hiring with the use of *veteran's preference* points for which they knew she did not qualify. Once the hiring was completed, they had a ready tool by which to extort manipulative compliance of her father's behavior. Ms. JoAnn Waterman's report (**Exhibit P**) substantiates the fact that Ms. Thrasher did not want to fire Ms. Bell, but was forced to capitulate and not allowed to keep Ms. Bell on in her Mental Health position. Many persons who worked with Ms. Bell wrote letters of recommendation informing the administration of the superb work that Ms. Bell had done during the time she worked at VA-Alexandria. It is of note that since Ms. Bell was fired, her replacement quit the job citing too heavy a work load as the reason. When Ms. Thrasher reported this fact to Ms. Watkins, the director's reply was "we must fill this

-39-

position immediately."

Ms. Watkins, Director of Veteran Affairs Medical Center at

Alexandria, Louisiana, executed the premeditated act of firing Ms. Bell

shortly after Mr. Tullis participated in a law suit to destroy her leadership

over this Mafia-styled organization. Both Ms. Watkins and Dr. Reed

committed mail fraud in order to continue control and intimidation.

Ms. I'Keisha Logan would not have been physically attacked by Dr.

Negi had her superiors properly fired Dr. Negi for harming the many

veterans under her care.  This deliberate assault proves the extent of

intimidation that exist in this facility.   After no action against Dr. Negi Ms.

Logan had no choice but to make a formal charge.  See Exhibit A-54 - 57.

**Exhibit 57 proves intent to illegally enter her computer by Dr. Negi.**

### SECTION V
### Procedures in Place to Prevent Filings of Patients' Complaints

I would also would like to call to the Court's attention a second

Affidavit from Floyd Hamilton III which highlights the procedures in place

at VA-Alexandria that impedes the intake of patient complaints because of

the deceptive nature of cataloguing such information:

> Oral complaints are not officially recorded nor acted upon and the
> complainant is not aware of this procedure; the complaint must
> specifically request that his complaint be made in writing and that an

action be taken. I was also informed by the patient representative that, although, I was putting my complaint in writing, it must be brought to risk management board for review before being acted upon. It was also my understanding that this board is made up of hospital personnel.

The fact that Barbara Watkins has total control of the administration  and intimidates all employees makes the board, in essence, a pawn at her disposal and therefore ineffective.  She controls every aspect under her domain.  The most compelling evidence that we have to expose the extent at which Ms. Watkins is willing to be disingenuous and makes untrue statements to maintain her power and control of VA-Alexandria is the letter that she sent to Congressman Rodney Alexander (**Exhibit C**) as well as, the firing of an employee as an extortive act against the employee's father (**Exhibit L**). Barbara Watkins had the audacity to make the statement about Ms. Bell's father making a mistake in front of a union representative (**Exhibit R**).  Add to this the fact that most complainants are not even aware their verbal complaints are non existent.

## REMEDY

Due to the fact that the malicious destructive acts committed unjustly and undeservedly against this completely innocent particular population of men and women who have served their country personally or in a secondary

-41-

manner we ask this jury to award each member patient/family member who lost life, or limb $5,000,000.00.   We are also requesting all wages lost by Ms. Debi Bell, rehire, and a monetary award of $500,000.00 for mental anguish for her and her children.   We also request a $200,000.00 award for Mr. Fitt for mental anguish and loss of Benefits claim upgrade due to not having psychiatric care. We also request $200,000.00 for Mr. Tullis & Mr. Mitchell's mental anguish, improper care & fear Mr. Mitchell suffered for arrest Warrant & Mr. Tullis's daughter.   If this Jury feels that the actions of these defendant's are so horrific that we have requested too small an award we request that it uses its discretion to adjust any award appropriately.   We also request the Jury instruct the Judge to forward a copy of this case, exhibits & testimony to U.S. Prosecutor for all crimes committed by said defendants.


Ruth L. Johnson
In Proper Person

Bertha M. Hamilton
In Proper Person

Lavelle T. Tullis
In Proper Person

Debi (Tullis) Bell
In Proper Person

Johnny W. Fitt
In Proper Person

Jessie Gray Jr.
In Proper Person

Rogetta T. Odhams
In Proper Person

Jessie L. Wade
In Proper Person

Carolyn A. Davis
In Proper Person

Dennis M. Egelston
In Proper Person

Richard Mitchell
In Proper Person  *KB*

Karen S. Davis
In Proper Person  *KB*

## CERTIFICATE OF SERVICE

    We certify that a copy of this document has been forwarded to the Office of the General Cousel, Attn: Civil Process Clerk, Assistant United States Attorney, 300 Fanin Street,  Shreveport, Louisiana 71101 - 3068 on this the _____ day of _____ 2010.